# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

MARCUS JONES,  )
        Plaintiff,  )
          )  No. 13 C 3712
v.  )
          )  Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN, Acting  )
Commissioner of Social Security,  )
        Defendant.  )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Marcus Jones moves to reverse or remand the final determination by the Commissioner of Social Security ("Commissioner"), denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") (doc. # 19). The Commissioner has filed a cross-motion for summary judgment, seeking affirmance of the decision (doc. # 30).[2] For the reasons set forth below, we grant the Commissioner's motion and deny Mr. Jones's motion.

## I.

On April 22, 2010, at the age of 35, Mr. Jones applied for SSI and DIB, alleging a disability onset date of March 1, 2010 (R. 126-32). His last-insured date was September 30, 2010 (R. 170). Mr. Jones's claims were denied initially and upon reconsideration, and a hearing was held before an Administrative Law Judge ("ALJ") on September 8, 2011 (R. 41). In a written opinion issued on September 22, 2011, the ALJ concluded that Mr. Jones was not

---

[1]On June 7, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 5, 6).

[2]As plaintiff did not file a reply memorandum or seek additional time to do so, we previously ruled that plaintiff waived his reply (doc. # 32).

disabled and denied benefits (R. 34). The Appeals Council denied Mr. Jones's request for review of the ALJ's decision (R. 1-6), making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981; *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. We review Mr. Jones's medical record in Part A; the hearing testimony in Part B; and the ALJ's written opinion in Part C.

### A.

Prior to his alleged onset date of March 1, 2010, Mr. Jones had sought treatment between July 2006 and December 2007 from an internist, Dr. Frances Norlock, D.O., for sarcoidosis;[3] diminished and cloudy vision; left-sided numbness, weakness, and imbalance; severe headaches; abdominal pain; shortness of breath; pancreatitis; and alcohol hepatitis (inflamed liver) (R. 228-31, 237-38). At those visits, Dr. Norlock prescribed medication for pain and nausea, and advised Mr. Jones to stop drinking beer (*Id.*). A CT scan and MRI from October 2007 showed no evidence of active neurosarcoidosis, and Mr. Jones's cranial nerves were intact except for slight lateral nystagmus (involuntary, rapid eye movement) (R. 229, 257-59).[4] Dr. Norlock recommended that Mr. Jones see a neurologist to rule out meningeal sarcoidosis, visit an eye doctor to address his uveitis (swelling of the uvea), continue taking Prednisone for sarcoidosis, and obtain pulmonary function tests (R. 229).

The medical record contains no treatment records for the next two and one-half years, until Mr. Jones returned to Dr. Norlock on June 21, 2010 (more than three months after his

---

[3]Sarcoidosis is the growth of tiny collections of inflammatory cells in different parts of the body. Sarcoidosis may cause fatigue; swollen lymph nodes; lung symptoms such as shortness of breath, coughing, and chest pain; skin rashes or lesions; and eye symptoms including blurred vision, eye pain, redness, and light sensitivity. http://www.mayoclinic.org/diseases-conditions/sarcoidosis/basics/symptoms/con-20022569.

[4]The medical scans also showed evidence of chronic sinusitis (R. 257-59).

2

alleged onset date). During that visit, Mr. Jones complained of sarcoidosis, uveitis (including black spots in his right eye), shortness of breath when walking less than one block, weakness below the knees, night chills and sweats, and stomach pain (R. 279). During a physical examination, Dr. Norlock found crepitus (a grating or crackling sound or sensation) bilaterally in Mr. Jones's knees, but no joint line tenderness or swelling (R. 280). Dr. Norlock restarted Mr. Jones on Prednisone for his sarcoidosis and referred him for pulmonary function tests, chest and knee x-rays, and an eye examination (R. 279-80).

On that date, Dr. Norlock also prepared a Pulmonary Residual Functional Capacity ("RFC") Questionnaire. She listed his impairments as sarcoidosis (diagnosed in August 2003), uveitis of the left eye, gastroesophageal reflux disease ("GERD"), and bilateral knee pain (R. 282). Dr. Norlock wrote that Mr. Jones suffered acute sarcoid attacks from exposure to irritants, allergens, and weather changes, which caused him shortness of breath, chest tightness, fatigue, and frequent coughing episodes resulting in coughing up blood (*Id.*). She noted that Mr. Jones's symptoms would frequently interfere with his attention and concentration and cause him constant fatigue (R. 283). Nevertheless, Dr. Norlock stated that Mr. Jones was capable of low-stress jobs, and his prognosis was fair (*Id.*).

Dr. Norlock further opined that Mr. Jones could continuously sit for forty minutes at a time, continuously stand for five to ten minutes at a time, and sit for about two hours total and stand/walk for less than two hours total in an eight-hour working day (R. 284). In addition, she wrote that Mr. Jones would need to take unscheduled breaks every twenty to thirty minutes for fifteen to twenty minutes at a time, could occasionally carry a maximum of ten pounds, and should avoid exposure to environmental irritants (R. 284-85). Dr. Norlock indicated that Mr.

3

Jones's impairments would likely produce good days and bad days, and likely cause him to miss work more than four times a month (R. 285).

Mr. Jones continued to complain of shortness of breath in July and August 2010. Pulmonary function tests showed only a mild reduction in lung capacity, though this was a significant reduction from his previous testing in January 2004 (R. 291, 298, 338, 347).

On August 18, 2010, state agency consulting physician Charles Carlton, M.D., examined and assessed Mr. Jones. Mr. Jones reported suffering weakness and pain in his right knee, and Dr. Carlton observed that he tended to avoid complete weight-bearing on the right leg, displayed some difficulty rising to a standing position and walking on toes and heels, and displayed 4/5 motor weakness in right hip flexors and right knee extensors; nonetheless, Mr. Jones otherwise could sit, stand, and walk without assistance (R. 291-93). Dr. Carlton observed loss of muscle mass and scarring in Mr. Jones's right thigh, and an x-ray showed abnormalities in the bones and soft tissue of the right knee (R. 291, 302).[5] Regarding Mr. Jones's vision, Dr. Carlton measured 20/50 corrected in the right eye, but worse than 20/200 corrected vision in the left eye (R. 297). Dr. Carlton concluded that Mr. Jones could lift up to twenty pounds, and sit, stand, and walk greater than fifty feet without assistance (R. 292).

On August 31, 2010, state agency medical consultant Towfig Arjmand, M.D., reviewed Mr. Jones's medical records and prepared a Physical RFC Assessment (R. 303). He opined that Mr. Jones could lift and/or carry up to twenty pounds occasionally and ten pounds frequently; stand and/or walk for a total of two hours and sit for a total of six hours in an eight-hour workday; had a limited ability to push and/or pull in the lower extremities; could occasionally

---

[5] The x-ray showed ossification and calcification in the right knee. Ossification is the condition of being altered into a hard bony substance. http://www.merriam-webster.com/medlineplus/ossification. Calcification is the abnormal deposit of calcium salts within tissue. http://www.merriam-webster.com/medlineplus/calcification.

4

climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes or scaffolds; and should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards (R. 304-05, 307). Dr. Arjmand also found that Mr. Jones had no manipulative limitations, but had visual limitations as to far acuity, depth perception, and field of vision (R. 306).

Dr. Arjmand explained that his opinion differed from Dr. Norlock's June 21, 2010 opinion because Dr. Norlock's opinion preceded the August 2010 pulmonary function testing which showed that Mr. Jones's pulmonary functional limitations were not of listing level and were not as severe as Dr. Norlock opined (R. 309). In addition, Dr. Arjmand stated that Mr. Jones's bilateral knee pain was not as functionally limiting as Dr. Norlock concluded because the consultative examiner (Dr. Carlton) opined that despite objective evidence of right knee pain, Mr. Jones could still lift, carry, stand, and walk with only some difficulties due to right leg weakness (*Id.*). Dr. Arjmand gave only partial weight to Dr. Norlock and Dr. Carlton (*Id.*).

On September 28, 2010, Mr. Jones had his first eye examination since 2003 (R. 337). Mr. Jones was diagnosed with sarcoid uveitis in both eyes, and was prescribed steroid eye drops (*Id.*). On October 7 and 21, 2010, Mr. Jones's sarcoid uveitis (greater in the left eye than the right) was much improved, and on November 4, 2010, Mr. Jones denied having any pain or blurry vision, and said that he no longer saw black spots (R. 334-36). On October 28, 2010, Mr. Jones also visited a pulmonologist, Swamy Nagubadi, M.D., complaining of a mild, dry cough and shortness of breath (R. 326). The results of Mr. Nagubadi's physical examinations, including respiratory, were normal (*Id.*). Considering this new evidence, on November 23, 2010, state agency medical consultant Victoria Dow, M.D., affirmed Dr. Arjmand's findings on the

basis that the evidence since August 31, 2010, did not indicate new or worsening allegations (R. 320).

On December 3, 2010, Mr. Jones saw Dr. Norlock for a checkup, complaining of a sarcoidosis flare-up, right eye uveitis, bilateral knee pain, GERD, pancreatitis, and anxiety (R. 329). Dr. Norlock referred Mr. Jones to an ear, nose, and throat specialist and prescribed Tramadol for his knee pain (*Id.*). A December 16, 2010 CT scan of the chest showed interstitial thickening in upper lung fields, correlating with sarcoidosis (R. 345).

On January 13, 2011, Mr. Jones visited otolaryngologist Jian Ye, M.D. (R. 342-43). Dr. Ye noted a painless, mobile mass under Mr. Jones's chin, which Mr. Jones reported had not changed in six months (R. 342). On January 14, 2011, Mr. Jones returned to Dr. Nagubadi, complaining of a mild dry cough, difficulty breathing, and sarcoidosis (R. 339). Dr. Nagubadi noted that Mr. Jones had no recent sarcoidosis flare-ups, and the rest of his physical examination was normal, including respiratory, cardiovascular, gastrointestinal, and musculoskeletal (range of motion, strength, and gait) testing (R. 339-40). On January 20, 2011, Mr. Jones visited his eye doctor, who noted sarcoid uveitis in both eyes, but reported that Mr. Jones had no new complaints (R. 332). The eye doctor continued Mr. Jones on the steroid eye drops (*Id.*).

On July 15, 2011, Mr. Jones visited Dr. Norlock for a follow up and medication refill; he reported going to the hospital for shortness of breath in February 2011 and chest pain and left-sided numbness in March 2011 (R. 371). Dr. Norlock completed another RFC questionnaire after this visit, adding left knee pain and loss of vision in left eye to the diagnoses she had listed previously (R. 352). She reported recent abnormal pulmonary function testing and the CT scan of Mr. Jones's chest showing increased interstitial thickening, as well as Mr. Jones's "intermittent" symptoms of shortness of breath, chest tightness, wheezing, fatigue, and coughing,

6

which were precipitated by changes in weather (*Id.*). Dr. Norlock opined that Mr. Jones was incapable of even low stress jobs due to his fatigue, shortness of breath, and frequent interference with attention and concentration, and he would likely to be absent from work more than four times a month (R. 353-55). Dr. Norlock noted that during an average sarcoid attack, Mr. Jones is incapacitated three to five days, and Prednisone made him jittery, anxious, and shaky (R. 352-53). She stated that Mr. Jones could continuously sit for one hour and stand for ten minutes; stand/walk a total of less than two hours; sit for two hours total; occasionally lift/carry ten pounds; stoop twenty percent of the day; and crouch ten percent of the day (R. 354). In addition, Mr. Jones would need to take unscheduled breaks every two to three hours for fifteen to twenty minutes at a time, and should avoid exposure to environmental irritants and extreme weather (R. 354-55). At a follow-up visit on July 27, 2011, Mr. Jones complained of shortness of breath, cough, and sore throat (R. 366), but no pain (R. 370).

**B.**

At the hearing before the ALJ on September 8, 2011, Mr. Jones (represented by counsel) and a vocational expert ("VE") testified. Mr. Jones testified that he lives with his wife, their three children (ages fifteen, ten, and one), and his wife's 21-year-old cousin in a second floor apartment (R. 43-44, 57). His wife works full-time on a rotating schedule and does the grocery shopping and cooking; Mr. Jones cares for the baby (with his wife's cousin) and does light housework when his wife is at work (R. 43-46, 51). He is tired the majority of the time, but he manages to throw the football around every now and then with his son (R. 50, 53-55). Mr. Jones also occasionally reads the paper and helps his kids with their homework (R. 56).

Mr. Jones last worked full-time, for less than one month, as a telemarketer between six and twelve months prior to the hearing (R. 46). He testified that his past work was usually short-

7

lived due to the fatigue he suffers, and he sleeps a lot during the day if his wife is home (R. 47, 60). The telemarketing job also required him to stare at a computer screen for hours, which he could not do because of his uveitis and left eye blindness (R. 58-59). He also has to lie down after taking his medicine because it gives him the shakes (R. 59).

In addition to suffering from sarcoidosis and uveitis, Mr. Jones testified that he is bothered by arthritis in his left leg; he takes Naproxen for the arthritis, which hurts his stomach (R. 49, 60). He stated that he can only walk a block and a half at most and stand for ten to fifteen minutes (R. 53). Mr. Jones testified that he has no problem sitting as long as he can stretch out his legs or get up and move around a little bit every now and then (*Id.*). He climbs twenty stairs to his apartment two or three times a day, but he has to sit down for twenty to thirty minutes afterward (R. 57).

The ALJ asked the VE to describe the work available to a younger individual with a high school education who could lift and carry twenty pounds occasionally and ten pounds frequently and could stand or walk four hours or sit six hours in an eight-hour workday, but is unable to work at heights, climb ladders, or be exposed to dangerous or moving machinery or environmental irritants (R. 61-62). In addition, the individual could not do work requiring fine visual discrimination and would be off task about five percent of an eight-hour workday (*Id.*). The VE stated that sedentary, unskilled positions, such as information clerk, order clerk, and bench assembler were available so long as the individual could be on-task eighty to ninety percent of the day and have only one absence per month (two-thirds of a day for new employees) (R. 62-63).

## C.

On September 22, 2011, the ALJ issued a written decision finding Mr. Jones not disabled and denying him benefits (R. 34). The ALJ applied the familiar five-step process for determining disability, which requires the ALJ to evaluate sequentially whether: (1) the claimant has engaged in any substantial gainful activity since the alleged disability onset date; (2) his impairment or combination of impairments is severe; (3) his impairments meet or medically equal a listed impairment; (4) his RFC prevents him from performing his past relevant work; and (5) his RFC prevents him from performing any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520.

At Step 1, the ALJ determined that Mr. Jones had not engaged in substantial gainful activity since his alleged disability onset date of March 1, 2010 (R. 22). Next, at Step 2, the ALJ found that Mr. Jones's severe impairments were sarcoidosis, multiple dystrophic areas of calcification and ossification in the right knee, and loss of vision (*Id.*).

At Step 3, the ALJ determined that Mr. Jones's impairments did not meet or medically equal a listing (R. 22). With respect to Mr. Jones's knee pain, the ALJ explained that Listing 1.02 was not met because the consultative examiner and Mr. Jones's treating physicians found that he could walk more than fifty feet unassisted and had normal muscle, strength, and gait; thus, Mr. Jones did not demonstrate an inability to ambulate effectively under the Listing (R. 23). The ALJ found that Mr. Jones's vision loss did not meet Listing 2.02, which requires a claimant's better eye to have best corrected vision of 20/200 or less because Mr. Jones's right eye had best corrected vision of 20/50 (*Id.*). Lastly, the ALJ determined that Mr. Jones's sarcoidosis did not meet Listing 3.02 (chronic pulmonary insufficiency) because his pulmonary function tests did not reveal values of listing level severity (*Id.*). His sarcoidosis also did not

9

meet Listing 3.03A (chronic asthmatic bronchitis) or 3.03B because Mr. Jones did not require physician intervention at least six times a year, and his condition was "relatively well-controlled" with medication (*Id.*).

The ALJ then determined that Mr. Jones had the RFC to lift and carry twenty pounds occasionally and ten pounds frequently, and stand/walk about four hours and sit about six hours in an eight-hour workday, with normal rest periods (R. 23-24). Furthermore, "[h]e is unable to work at heights, climb ladders, or frequently negotiate stairs; he may only occasionally crouch, kneel, or crawl; he should avoid concentrated exposure to fumes, dust, odors, gases or poorly ventilated areas; he should avoid operation of moving or dangerous machinery; and he lacks depth perception so he is not suited for work requiring fine visual discrimination" (R. 24). In addition, the ALJ determined that Mr. Jones would be expected to be off task five percent of the time in an eight-hour workday (*Id.*).

In support of this RFC, the ALJ analyzed Mr. Jones's daily activities, his claimed limitations, and the medical record (R. 24-32). The ALJ noted that Mr. Jones alleged that his medicine made him fatigued and shaky, but he had no trouble with personal care and he engaged in social activities, read, played sports, wrote, and watched television (R. 24, 30). Mr. Jones also testified that he was able to do light housework and watch the children when his wife was not home, including feeding and changing diapers for his youngest child, but he had some trouble lifting her (she weighed twenty to thirty pounds) (R. 30).

The ALJ found that while Mr. Jones's medically determinable impairments could reasonably be expected to cause the alleged systems, he was "not a credible witness and his claims of significantly limited functioning are not supported by the objective medical facts of the case" (R. 30-31). *First*, the ALJ pointed to medical examinations undermining Mr. Jones's

claims of disabling impairment: October 28, 2010 and January 14, 2011 testing showing that Mr. Jones had normal range of motion, strength, and gait, and no musculoskeletal complaints on July 27, 2011 (R. 31); August 2010 and October 2010 pulmonary function tests showing only mild restriction in lung capacity pre-medication and post-medication, clear lungs, and normal breathing sounds (R. 27-28); and notes from his eye doctor in October and November 2010 indicating that his sarcoid uveitis was "much improved" from September 2010 (his first visit to the eye doctor since 2003), after he was prescribed steroid eye drops (R. 28-29).

*Second*, the ALJ reasoned that Mr. Jones's "described daily activities were not as limited to the extent one would expect, given the complaints of disabling symptoms and limitations," as Mr. Jones was able to "perform household chores and care for three children" (R. 31). *Third*, the ALJ explained that large gaps in Mr. Jones's medical treatment demonstrated that Mr. Jones's impairments were not as severe as he claimed. Mr. Jones did not see a physician between November 2007 and June 2010 (including a three-month lag in seeking treatment after his alleged onset date in March 2010), and there was a seven-year gap in treatment from his eye doctor (R. 26, 31).

*Fourth*, the ALJ opined that Mr. Jones "had not generally received the type of medical treatment one would expect for a totally disabled individual" (R. 31). The ALJ noted that Mr. Jones's complaints of knee pain were inconsistent and not mentioned in his application for benefits (*Id.*). The ALJ also pointed out the "interesting" July 15, 2011 diagnosis by Dr. Norlock of left knee pain, although all of Mr. Jones's prior complaints had been related to his right leg/knee (R. 29-30). Moreover, Mr. Jones's treatment for his leg pain was "essentially routine and/or conservative in nature," as it was limited to occasional prescriptions for Tramadol (R. 31). Mr. Jones also had "significant periods of time" since his alleged onset date where he did not

11

take medications for his other alleged impairments, as demonstrated by Dr. Norlock's June 2010 note that Mr. Jones had not taken Prednisone for three to four months (*Id.*).

The ALJ also explained that the record showed that Mr. Jones's impairments were present at approximately the same level of severity prior to his alleged onset date, indicating that the impairments would not presently prevent Mr. Jones from working (R. 31). Moreover, the ALJ noted that Mr. Jones worked (at a level less than substantial gainful activity) after his alleged onset date, indicating that his daily activities have at times been greater than what Mr. Jones reported (*Id.*).

The ALJ "rejected" Dr. Norlock's June 21, 2010 RFC opinion as inconsistent with the greater weight of the evidence (R. 31). He did not give her opinions "much weight" because "she apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what [he] reported" (R. 31-32). The ALJ found this to be problematic, given the ALJ's opinion that there were "good reasons for questioning the reliability of the claimant's subjective complaints" (R. 32). Moreover, the ALJ noted that before writing that RFC opinion, Dr. Norlock had not seen Mr. Jones since October 29, 2007 (*Id.*). The ALJ also noted that one aspect of both Dr. Norlock's June 2010 and July 2011 RFC opinions – that Mr. Jones could lift up to ten pounds occasionally – was consistent with the ALJ's RFC determination (*Id.*).

The ALJ assigned "considerable weight" to the state agency consultants' opinions (R. 32). The ALJ "agree[d] with the state agency assessment . . . that the claimant could perform at the sedentary level," but added a limitation that Mr. Jones can be off task five percent of the time in an eight-hour workday "to address the claimant's complaints of fatigue, shortness of breath,

coughing, and pain" (*Id.*). The ALJ found this was consistent with Mr. Jones's testimony that he had no trouble sitting as long as he could stretch his legs (*Id.*).

After determining Mr. Jones's RFC, at Step 4 the ALJ determined that Mr. Jones had no past relevant work that he could perform (R. 32). At Step 5, the ALJ adopted the VE's opinion that a claimant with Mr. Jones's limitations could nevertheless perform the requirements of certain sedentary and unskilled occupations, so long as he would not miss more than one day of work per month (2/3 of a day during the probationary period) and be on task eighty to ninety percent of the time (R. 33). Therefore, the ALJ found that Mr. Jones was not disabled during the relevant time period and denied him benefits (*Id.*).

### III.

Mr. Jones seeks reversal or remand of the ALJ's decision on the grounds that: (1) the ALJ failed to properly weigh the opinion of his treating physician, Dr. Norlock, and (2) the RFC failed to account for all of Mr. Jones's impairments (doc. # 20: Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl. Mem.") at 4-5). For the reasons stated below, we reject Mr. Jones's challenges and find that substantial evidence supports the ALJ's decision.

### A.

"We will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)). The Court will not reweigh the evidence or substitute its judgment for that of the ALJ. *Id.* at 362 (citing *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012)). "In rendering a decision, an ALJ 'must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece

13

of testimony and evidence.'" *Id.* (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)).

**B.**

Mr. Jones argues that the ALJ erred in rejecting Dr. Norlock's opinion because the ALJ: did not adequately explain his decision to give more weight to the state agency physicians, impermissibly substituted his lay opinion for that of the medical professionals, and wrongly found Dr. Norlock's opinions to be inconsistent with the medical evidence of record (Pl.'s Mem. at 4-8). We disagree with each of these criticisms.

A treating physician's opinion is entitled to controlling weight if it is "supported by medical findings and consistent with substantial evidence in the record." *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) (citing *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008)). "But once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight and becomes just one more piece of evidence for the ALJ to consider." *Id.* at 1099-1100 (internal quotations omitted). Nevertheless, "[w]hen an ALJ chooses to reject a treating physician's opinion, []he must provide a sound explanation for the rejection." *Schreiber v. Colvin*, 519 Fed. App'x 951, 959 (7th Cir. 2013).[6] In addition, in deciding what weight to give the treating physician's opinion, the ALJ must consider the factors set forth in 20 C.F.R. § 404.1527, which include the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and support for the physician's opinion. *Elder*, 529 F.3d at 415.

---

[6]Plaintiff argues that even if a treating physician's report is not given controlling weight, it is "still deserving of some weight" (Pl.'s Mem. at 6). This is not the law. While the ALJ may not ignore a treating physician's opinion, *see Bates*, 736 F.3d at 1100 n.4, he is not required to give it a certain amount of weight. The ALJ here considered and discussed Dr. Norlock's opinions, and adequately explained why he did not give them "much weight."

14

In rejecting Dr. Norlock's opinions, the ALJ discussed Mr. Jones's medical evidence and treatment history at length before finding that Mr. Jones's conditions as described by Dr. Norlock were "inconsistent with the greater weight of the evidence" and did not warrant "much weight" (R. 31). The ALJ noted the long gaps in treatment that preceded Dr. Norlock's medical opinions, which further diminished the weight to which they were entitled (R. 32). While the ALJ "did not explicitly weigh each factor" from 20 C.F.R. § 404.1527 in discussing Dr. Norlock's opinion, "his decision makes clear that he was aware of and considered many of the factors, including [Dr. Norlock's] treatment relationship with [Mr. Jones], the consistency of her opinion with the record as a whole, and the supportability of her opinion." *Schreiber*, 519 Fed. App'x at 959-60. In *Schreiber*, as in the instant case, this discussion was sufficient to build an "accurate and logical bridge" between the evidence and the ALJ's conclusion. *See Id.* (noting that in *Elder*, 529 F.3d at 415-16, the appellate court affirmed the denial of benefits where the ALJ had discussed only two of the relevant factors laid out in 20 C.F.R. § 404.1527).

Furthermore, the ALJ observed that Dr. Norlock "seemed to uncritically accept as true most, if not all" of Mr. Jones's subjective reports of symptoms and limitations (R. 31-32). Where a treating physician's opinion is based on the claimant's subjective complaints, the ALJ may discount it. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). The ALJ here explained that he did not find Mr. Jones's allegations as to the severity of his impairments and functional limitations credible in light of his daily activities (which included caring for three children and doing household chores) and the conservative nature of the treatment which he received, including "significant periods of time" when Mr. Jones did not take medication or receive treatment (R. 31). This credibility determination (which is not challenged by Mr. Jones) was supported by substantial evidence and was not patently wrong; likewise, the ALJ's

15

assessment of the treating physician's opinion based primarily on Mr. Jones's subjective complaints was also supported by substantial evidence. *See Bates*, 736 F.3 at 1100.

In addition, contrary to Mr. Jones's argument, the ALJ did not impermissibly substitute his lay opinion for that of the medical professionals in determining Mr. Jones's RFC. The RFC is a legal decision for the ALJ to make after considering all of the relevant medical and nonmedical evidence. *Foglio v. Colvin*, No. 12 C 5270, 2014 WL 684643, at *10 (N.D. Ill. Feb. 19, 2014); *see also Bates*, 736 F.3d at 1100 n.4 (citing 20 C.F.R § 404.1527(d)). In determining a claimant's RFC, the ALJ is not required to rely entirely on a particular physician's opinion. *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). If conflicting medical evidence is present, the ALJ must set forth an RFC that resolves the conflicting evidence in a reasonable manner, *Murphy v. Astrue*, 454 Fed. App'x 514, 518 (7th Cir. 2012), and the ALJ must include a "narrative discussion" describing how the evidence supports the RFC determination, SSR 96–8p. Here, as in *Foglio*, the ALJ's determination as to the claimant's RFC was supported by substantial evidence because the ALJ adequately reviewed the claimant's medical records, physicians' opinions, testimony, and the other record evidence, and reasonably weighed the evidence both for and against greater RFC limitations. *See Foglio*, 2014 WL 684643, at *10.

## C.

Plaintiff also claims that the ALJ's RFC determination is flawed because it fails to account for all of his impairments (Pl.'s Mem. at 8-10). What plaintiff ignores is that the ALJ need not accept uncritically every impairment or limitation that a plaintiff asserts; rather, the ALJ must account for the impairments supported by the record. *See Bates*, 736 F.3d at 1098-99 (holding that the ALJ need not account for, or even discuss, the claimant's alleged limitations that had little support in the record). Here, the ALJ fulfilled that obligation.

As explained above, the ALJ carefully analyzed all of the relevant medical and nonmedical evidence, including the complaints of fatigue, knee pain, and worsening vision that Mr. Jones made to Dr. Norlock and his ophthalmologist as referenced in Mr. Jones's memorandum (*see* R. 26, 28-29). And, the ALJ addressed Mr. Jones's complaints of fatigue and shortness of breath in the RFC by adding a limitation that he could be off task five percent of the time in an eight-hour workday (R. 32). The ALJ also accounted for Mr. Jones's lack of depth perception by keeping him from "work requiring fine visual discrimination" (R. 24).

Moreover, the ALJ adequately explained why he did not include additional limitations based on Mr. Jones's alleged knee pain beyond limiting Mr. Jones to lifting and carrying twenty pounds occasionally and ten pounds frequently. The ALJ relied on Mr. Jones's testimony that he had some difficulty lifting his one-year-old, but that "he had no trouble sitting as long as he could stretch his legs" (R. 31-32). The ALJ also found that Mr. Jones's complaints of knee pain were inconsistent throughout his alleged period of disability, including switching from his right knee to his left, and he received only conservative treatment for pain (*Id.*).

We find that substantial evidence supported the ALJ's RFC assessment and the ALJ's decision to give little weight to Mr. Jones's treating physician's opinions.

## CONCLUSION

For the reasons stated above, we deny Mr. Jones's motion to reverse and remand the ALJ's decision (doc. # 19), and we grant the Commissioner's motion to affirm the denial of benefits (doc. # 30). This case is terminated.

ENTER:

**SIDNEY T. SCHENKIER**
**United States Magistrate Judge**

**DATED: July 15, 2014**